**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PATRICK PANTUSCO, : | |
| : | Civil Action No. 11-0680 (SDW) |
| Petitioner, : | |
| : | |
| v. : | **OPINION** |
| : | |
| MR. LAGANA, Administrator, et al., : | |
| : | |
| Respondents. : | |

**APPEARANCES:**

Patrick Pantusco
Northern State Prison
P.O. Box 2300
Newark, NJ  07114
      Petitioner pro se

Vered Adoni
Office of the County Prosecutor
Bergen County
10 Main Street
Hackensack, NJ  07601
      Counsel for Respondents

WIGENTON, District Judge

      Petitioner Patrick Pantusco ("Petitioner"), a prisoner currently confined at Northern State

Prison in Newark, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254.  The Respondents are Administrator Mr. Lagana and the Attorney General of

the State of New Jersey.  Petitioner presents three grounds for relief:  (1) ineffective assistance of

trial counsel; (2) that the New Jersey Statute on "felony murder" is unconstitutionally vague; and (3) that Petitioner's right to a fair trial was violated when jurors were permitted to continuously view him in shackles and handcuffs throughout his trial.  Most notably, Petitioner argues that he should not have been convicted of the felony murder of a third-party he struck and killed in a police chase as he fled apprehension for a robbery, because the police chase did not immediately follow the robbery.

For the reasons stated herein, the Petition shall be denied as without merit.

## I.  BACKGROUND

A.    Factual Background

This case revolves around a unique, and tragic, set of facts.[1]  At trial, the petitioner was accused of stealing a black 1991 Ford Explorer in Riverdale, New Jersey, and then of snatching several purses from women in the surrounding locale.

> The first purse snatching occurred after 4:00 in the afternoon of June 18. Vera Rattansingh got off work at that time and drove to the Bradlees store in Clifton. As she was walking toward the store, a vehicle described as a black Ford Explorer pulled beside her and the driver asked her for directions to Main Street in Nutley. … While Rattansingh looked for the street on a map, she realized that the man in the vehicle was attempting to take the purse off her shoulder. According to Rattansingh, "he pulled with so much force that he got the bag off my shoulder and I fell to the ground." The car ran over Rattansingh's left instep of her foot, and her arm and buttocks were bruised.
>
> …
>
> Shortly after the theft of Rattansingh's purse, at around 5:00 p.m. on June 18, Diane Dorry walked in the parking lot of the Paramus Park Mall. As Dorry

---

[1] This statement of facts is taken from the decision of the Superior Court of New Jersey, Appellate Division, issued on direct appeal in 2000.  Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

was walking from her vehicle to the mall she heard a man say "excuse me." She turned around and a man in a black Explorer asked her for directions to the Garden State Parkway. Dorry walked up to the car window and began giving him directions when he grabbed the handle of her purse and accelerated the vehicle. She let go of the purse in fear that she might be dragged by the moving car. She described that force was used because of the "pull on [her] shoulder ... at the time he was accelerating the gas." Dorry was not injured.

The third incident also occurred on the same day, while seventy-four year old Gloria Miskerik was shopping with her friend … also in Paramus. The women finished shopping at around 5:00 p.m., when they began walking back to their car. A car … approached the women and stopped to ask for directions …. While the two women were conversing about who was to give him directions, the man reached out of the car window, grabbed Miskerik's purse and "floored" the vehicle. Miskerik did not let go of the purse. She ran with the accelerating car until eventually she fell to the ground and was forced to let go of her purse. Miskerik was seriously injured by the moving car, leaving her with severe cuts to her head and shoulder, and a blood clot in her left hip. …

While defendant was stealing Miskerik's purse, an off-duty police officer, Albert Maas, was parking his car. He witnessed the entire event. Maas immediately directed another shopper to call 9-1-1 while he attended to the injured Miskerik. He then spoke to Paramus Police on the phone to give the dispatcher additional information regarding what he characterized as a "robbery."

State v. Pantusco, 330 N.J. Super. 424, 432-33 (App.Div. 2000) (footnotes omitted).

Following the theft of Miskerik's purse, at 5:36 pm, Patrolman Richard Skinner heard about two purse snatchings over a SPEN radio broadcast from the Paramus Police Department. Skinner was directed by his tour commander to "check Linwoods Avenue …" for the black Ford Explorer.  Skinner observed the vehicle on that road, and approached it to confirm the license plate and identity of the driver.  Thereafter, Skinner began to follow the vehicle and engage in a police chase:

At this point, Officer Skinner verified the license plate on his mobile computer terminal and turned his vehicle around to follow defendant. Thereupon defendant "passed the vehicles on the right side and then just shot through the stop sign." Skinner then activated his overhead lights and sirens, radioed headquarters to alert them that he found defendant, and continued to follow the vehicle south on Pascack Road.

…

Since traffic was heavy at the intersection of Oradell Avenue, thereby preventing defendant from turning right, he pulled into a Texaco Gas Station. Officer Skinner followed. Defendant then attempted to exit the gas station through another exit, but Skinner blocked that exit with his vehicle. As Skinner began to exit his car, defendant "rammed" the right front fender of the patrol car, causing Officer Skinner to hit his head on the car door jamb. Defendant was then able to exit the gas station and started to head north on Pascack Road. Officer Skinner drew his weapon, ran toward the defendant's car, and ordered him to stop. Defendant nonetheless continued to head north on Pascack Road, Officer Skinner returned to his car and attempted to follow.

At this point, Officer Skinner lost sight of defendant, but he noticed a man on the side of the road yelling, "he went down that way, he went down that way," pointing down Bedford Court. Skinner radioed to headquarters the location where defendant was heading, and turned down Bedford Court where he noticed the black Ford Explorer parked next to the curb on Rutgers Place. As Skinner approached the vehicle, defendant took off again, and Skinner followed him back onto Pascack Road. At this point, Officer Skinner described that defendant "was driving fast and recklessly."

In the interim, Officer Smith had the traffic stopped at the intersection of Pascack Road and Oradell Avenue, so as to block defendant from continuing down Pascack Road. However, defendant avoided Smith, and turned left down Oradell Avenue while Skinner followed close behind. At this point, other police vehicles joined the chase.

330 N.J. Super. at 434-35.

Toward the end of the chase, Officer Skinner observed that the black Ford Explorer had hit a red Chevrolet Blazer. The driver of the damaged Ford Explorer exited the vehicle, and fled on foot, only to be apprehended by Officer Skinner and other officers who had arrived. The medical examiner concluded that the driver of the Chevrolet Blazer died at the scene due to "multiple fractures and injuries" from the car accident. 330 N.J. Super. at 435-36.

B.    Procedural History

Following a jury trial in the Superior Court of New Jersey, Law Division, Bergen County, Petitioner was convicted of felony murder, N.J.S.A. 2C:11-3a(3); aggravated manslaughter, N.J.S.A. 2C:11-4a; resisting arrest, N.J.S.A. 2C:29-2; eluding a police officer,

N.J.S.A. 2C:29-2b; five counts of aggravated assault, N.J.S.A. 2C:12-1b;[2] three counts of robbery, N.J.S.A. 2C:15-1;[3] burglary and theft of an automobile, N.J.S.A. 2C:18-2 and 2C:20-3; and theft of a credit card, N.J.S.A. 2C:21-6c.  On February 4, 1998, the trial court sentenced Petitioner to an aggregate term of 50 years' imprisonment, with a 30-year parole disqualifier. (Answer, Ex. 1 at Da9-Da10, Judgment.)

On April 24, 2000, on direct appeal, the Superior Court of New Jersey, Appellate Division affirmed the felony murder conviction and sentence, directed the merger of the aggravated manslaughter and all the robbery convictions into the felony murder conviction, otherwise affirmed the judgment and concurrent sentences imposed for those crimes, and remanded for a corrected judgment.  State v. Pantusco, 330 N.J. Super. at 443-45.  On September 8, 2000, the Supreme Court of New Jersey denied certification.  State v. Pantusco, 165 N.J. 527 (2000).

On September 6, 2001, Petitioner filed with the trial court his first state petition for post-conviction relief ("PCR").  (Answer, Ex. 9, App. at 55 to 59.)  On July 9, 2003, following an evidentiary hearing limited to the question whether trial counsel were constitutionally ineffective for failing to request an eluding manslaughter charge, as a lesser-included offense of felony murder, the trial court denied relief.  (Answer, Ex. 34.)  On June 8, 2006, the Appellate Division affirmed the trial court's decision regarding the eluding manslaughter charge, but remanded to permit Petitioner to present additional claims for post-conviction relief to the trial court.  State v. Pantusco, Ind. No. S-997-96, 2006 WL 1549687 (N.J. Super. App. Div. June 8, 2006).  On

---

[2] Petitioner was acquitted of two additional counts of aggravated assault.

[3] The conviction regarding the robbery of Gloria Miskerik was in the first degree; the conviction regarding the robberies of Diane Dorry and Very Rattansingh were in the second degree.

November 9, 2006, the Supreme Court of New Jersey denied certification.  State v. Pantusco, 188 N.J. 576 (2006).

On November 10, 2006, Petitioner filed his amended state petition for post-conviction relief.  (Answer, Ex. 9, App. at 70-112.)  On June 20, 2007, after a non-evidentiary hearing, the PCR court denied relief.  (Answer, Ex. 35.)  On July 26, 2010, the Appellate Division affirmed the denial of post-conviction relief.  State v. Pantusco, Ind. No. 96-07-0997, 2011 WL 13850 (N.J. Super. App. Div. July 26, 2010).  On November 4, 2010, the Supreme Court of New Jersey denied certification.  State v. Pantusco, 205 N.J. 16 (2010).  This Petition followed.

Here, Petitioner asserts the following grounds for habeas relief under 28 U.S.C. § 2254: (1) ineffective assistance of trial counsel based upon (a) counsel's concession in the opening statement of Petitioner's guilt of the predicate crimes for felony murder, without Petitioner's prior knowledge or consent, (b) counsel's agreement to have Petitioner appear before the jury in handcuffs and shackles, and (c) counsel's failure to request a charge on the lesser-included offense of manslaughter by eluding, (2) New Jersey Statute 2C:11-3(a)(3) on "felony murder" is unconstitutionally vague, as applied to Petitioner, because it does not clearly define "immediate flight,"  and (3) Petitioner's right to a fair trial was violated when jurors were permitted to continuously view him in shackles and handcuffs throughout his trial.  (Petition, ¶ 12.)  Briefing is complete and this matter is now ready for decision.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), 28 U.S.C. § 2254 now provides, in pertinent part:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).

A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. See also Moore v. DiGuglielmo, No. 09-2189, 489 F.App'x 618, 624 n.2 (3d Cir. 2012) (noting the same). "This standard … is 'difficult to meet': To obtain habeas corpus relief from a federal court, a state prisoner must show that the challenged state-court ruling rested on 'an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement.'" Metrish v. Lancaster, 133 S.Ct. 1781, 1786-87 (2013) (quoting Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011)). In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Rainey v. Varner, 603 F.3d 189, 198 (3d Cir. 2010) (citing United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969)); Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989).

### III.  ANALYSIS

A.      Appearance in Handcuffs and Shackles

Petitioner contends that his right to a fair trial was violated when jurors were permitted to continuously view him in shackles and handcuffs throughout his trial, with the consent of his

trial counsel.[4]  This argument is fleshed out in Petitioner's Brief on appeal of the denial of post-conviction relief.  (Answer, Ex. 9, Brief at 18-26.)  There, Petitioner asserted that the trial court advised counsel, prior to the commencement of the trial, that the physical configuration of the courtroom, jury room, and holding cell, suggested the possibility that the jurors would see Petitioner being transported to and from the courtroom in handcuffs.  Accordingly, the trial court suggested that the case commence with a curative instruction, to which Petitioner's counsel apparently agreed.  Thereafter, Petitioner objected to the jurors seeing shackles being brought into the holding cell, his counsel put an objection on the record, and the trial court disagreed.  Petitioner argued that the jury continued to see him in handcuffs while being transported.  (Id. at 18-20.)

In rejecting this claim, the PCR noted that, at most, Petitioner may have been seen a few times being transported in handcuffs, not shackles.  The PCR court noted that there was no evidence that Petitioner was made to appear in court in handcuffs or shackles.  Finally, the PCR court noted that Petitioner suffered no prejudice, even if he was seen being transported in handcuffs, as evidenced by the jury instruction regarding the routine use of handcuffs to transport persons accused of serious crimes as well as by the fact that Petitioner was acquitted on two charges.  (Answer, Ex. 35, Tr. at 37-41.)[5]  The Appellate Division affirmed the denial of post-conviction relief.

> Defendant also complains he was observed or could have been observed in "handcuffs, leg irons and a waist harness and chains" during trial. However, the jury would understand that a homicide defendant would be in jail pending trial,

---

[4] Petitioner was represented at trial by co-counsel Joseph Rem and John Weichsel.  See State v. Pantusco, 2006 WL 1549687 at *1.

[5] In the alternative, the PCR court noted that the claim was barred pursuant to N.J.Ct.R. 3:2-4, because Petitioner should have raised the claim on direct appeal.  (Answer, Ex. 35, Tr. at 41.)

and it was so instructed. The judge expressly charged the jury at the outset of the trial:

> Now there's one other issue too that Mr.-in cases such as this where there's a felony murder or-not just felony murder but any serious case such as this, serious charges, it's customary that the defendant is incarcerated. Now Mr. Pantusco is incarcerated. And if you see him with handcuffs or with shackles on, that's the customary procedure if he's going to be over in the Bergen County Jail and be brought over here for trial.
>
> You are not to draw any negative or prejudicial inferences from that. That doesn't mean he's dangerous or anything. This is the procedure that is followed by anybody of this kind of serious case. So if you see him in the hallway or during the course of the trial, you're not to draw any inference, any negative inference, or hold it against him. That's a procedure in which a case like this would be handled. And that's why, okay? Do you understand that? And-otherwise we try to avoid you seeing that and we're going to be here three weeks. We're going to be living together for three weeks, all of us. So please, if you see Mr. Pantusco in handcuffs, that is not to be held against him. That's just the procedure and it's common practice for a case of a serious nature of this kind.
>
> Given that sound, curative instruction, we see no basis for PCR, whether or not the defendant can raise the claim for the first time through a PCR application. See R. 3:22-4. This subject was spelled out in the transcripts available on the direct appeal.

State v. Pantusco, 2011 WL 13850, *6-7.

The U.S. Supreme Court has emphasized that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." Deck v. Missouri, 544 U.S. 622, 626-29 (2005) (citing Estelle v. Williams, 425 U.S. 501 (1976) and Illinois v. Allen, 397 U.S. 337 (1970) (recognizing that a criminal defendant is prejudiced when he appears before the jury in shackles)). Nevertheless, where a court, without adequate justification, orders a defendant to wear shackles that will be seen by a jury, the error is subject to harmless-error analysis pursuant to Chapman v. California, 386 U.S. 18, 24 (1967). Id. at 635. See also United States v. Salehi, Nos. 03-3417, 03-3418, 03-

10

3419, 03-3916, 03-3430, 187 Fed.Appx. 157, 173-175, 2006 WL 1759855 at *12-14 (3d Cir. June 28, 2006) (applying harmless-error analysis to incident of shackling).

Numerous courts, moreover, have distinguished the situation in which a criminal defendant in shackles while being transported is briefly observed by jurors, generally finding such encounters harmless.  See, e.g., U.S. v. Lattner, 385 F.3d 947 (6th Cir. 2004), cert. denied, 543 U.S. 1095 (2005); United States v. Olano, 62 F.3d 1180, 1190 (9th Cir. 1995); Wright v. Texas, 553 F.2d 185 (5th Cir. 1976); D'Allessandro v. MacFarland, No. 04-6128, 2006 WL 2226330 (D.N.J. Aug. 3, 2006).

Here, there is no evidence to suggest that Petitioner suffered any harm even if some jurors saw him being transported in handcuffs or saw shackles being brought into the holding cell.  The decision of the state courts, applying harmless-error analysis, that Petitioner is not entitled to relief on this claim is neither contrary to nor an unreasonable application of the controlling Supreme Court precedent discussed supra.  Petitioner is not entitled to federal habeas relief with respect to this claim.

B.    Ineffective Assistance of Trial Counsel

Petitioner asserts that he was denied his Sixth Amendment right to effective assistance of counsel based upon (a) counsel's concession in the opening statement of Petitioner's guilt of the predicate crimes for felony murder, without Petitioner's prior knowledge or consent, (b) counsel's agreement to have Petitioner appear before the jury in handcuffs and shackles, and (c) counsel's failure to request a charge on the lesser-included offense of manslaughter by eluding.  The state courts rejected all of these claims of ineffective assistance.

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.

The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added) (citations omitted) (cited in <u>Ross v. Varano</u>, 712 F.3d 784, 797 (3d Cir. 2013)).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u> at 694.  Thus, counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Id.</u> at 687.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  <u>Id.</u> at 695.  The performance and prejudice prongs of <u>Strickland</u> may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."  <u>Id.</u> at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Strickland</u>, 466 U.S. at 689.  As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  <u>Id.</u> at 690-91.  If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of <u>Strickland</u>.

12

1.    Counsel's Alleged "Concession" Regarding the Predicate Felony

Petitioner contends that his trial counsel deprived him of constitutionally effective

assistance by conceding that Petitioner had committed felonies necessary to a conviction for

felony murder.

After having properly identified the Strickland standard, State v. Pantusco, 2011 WL

13850, *1-*2, the Appellate Division began its assessment of Petitioner's claim by noting that, in

his opening statement, defense counsel had said:

> This was a terrible day, a tragic day, a sad day. You're going to find Patrick
> Pantusco guilty of the car theft, and you're going to find Patrick Pantusco guilty of
> these person [sic] snatchings because he indeed was the person who did these
> purse snatchings, but I'm going to tell you now, Patrick Pantusco is not guilty of
> felony murder. And Judge Sullivan is going to talk to you about the meaning of
> felony murder and what felony murder is. And you're not going to find Patrick
> Pantusco guilty of aggravated manslaughter.

Id., 2011 WL 13850 at *2.  Later, in his summation, defense counsel acknowledged that

Petitioner had "snatch[ed]" the purses of three women at three different locations, but argued that

the purse snatchings were not "robberies" and that Petitioner may have been driving recklessly,

but that it wasn't during a "flight" from a robbery, even if there had been a robbery.  Id. at *3.

Finally, defense counsel emphasized that the State had to prove "immediate flight" from a

robbery, and argued that Petitioner was fleeing from arrest after he saw the pursuing police, not

from the robbery.  Id. at *4.

The Appellate Division then rejected Petitioner's claim on the ground that trial counsel

had been pursuing a legitimate trial strategy.

> The statements in counsel's opening statement do concede defendant's
> guilt of the purse snatchings, but his summation demonstrates that the purpose of
> the concession was to emphasize the difference between a purse snatching and a
> robbery. In context, counsel's obvious strategy was to avoid a conviction of a
> predicate felony necessary for a felony murder conviction. Thus, defendant's
> present attack is on the type of "strategy" which cannot give rise to a claim of

13

ineffective assistance of counsel. Even if the opening statement was not sufficiently clear to the jury that the concession was to theft only, as opposed to robbery, the summation occurring just before the final charge made that clear.

The fact there was no concession of participation in a robbery is critical, because such a concession in this case where a fatality ensued would be an admission of felony murder. Given the anticipated final instructions, here the concession focused the jury on returning a verdict for lesser included thefts by purse snatchings that did not include all the elements of robbery, the predicate for a felony murder conviction and its required sentence of thirty years before parole eligibility.[FN1] It is significant to note that the judge charged the jury on lesser included theft offenses on counts ten, twelve, and thirteen. See also State v. Sheika, supra, 337 N.J. Super . at 242, where we were "satisfied that counsel's concession [of robbery] constituted a reasonable strategy in light of the evidence presented" concerning the cause of the victim's death. As in Sheika, "counsel's concession here was part of a carefully crafted defense designed to result in an acquittal of the felony murder count." Id. at 243.

> FN1. Counsel also gave an impassioned closing to the effect that defendant could not be convicted of felony murder because the death was too remote and attributable to the police conduct in conducting a chase which violated the Attorney General's guidelines. That subject was reviewed on the direct appeal. State v. Pantusco, supra, 330 N.J.Super. at 441-43. Counsel also developed the lack of a "flight." In other words, he conceded the basis of guilt for lesser offenses in the hopes of avoiding a felony murder conviction.

The defense strategy, although unsuccessful, was sound. It had some prospect of success because defendant conceded wrongdoing in a case involving the death of an innocent woman as a result of a chain of events started by defendant's conduct. But it left the jury the option of convicting him of certain crimes, including lesser included offenses, without convicting him of felony murder.

However, defendant further contends that defense counsel's concession required defendant's consent because the concession effectively functioned as a guilty plea. He states "[t]he decision to plead guilty or not guilty is reserved solely for the accused" and that counsel "may not stipulate to facts which amount to the functional equivalent of a guilty plea without the knowing and voluntary consent of the client." Those propositions seem fundamental. But, as already noted, here the concession was not to robbery or to felony murder. It was made to avoid a conviction for those more serious offenses.

2011 WL 13850, *4-5 (citations omitted).

14

The Appellate Division then went on to explain how the PCR judge's ruling comported with Supreme Court law.

> We agree with the PCR judge's reliance on <u>Florida v. Nixon</u>, 543 U.S. 175, 125 S.Ct. 551, 160 L. Ed.2d 565 (2004), a capital case, which involved a "defense counsel's strategic decision to concede, at the guilt phase of the trial, the defendant's commission of murder, and to concentrate the defense on establishing at the penalty phase, cause for sparing the defendant's life." <u>Id.</u> at 178, 125 S.Ct. at 555, 160 L. Ed.2d at 572. The Court held that defense counsel must consider both the guilt and penalty phases in determining how to proceed in a capital case; however, Justice Ginsburg wrote that when "counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent." <u>Id.</u> at 192, 125 S.Ct. at 563, 160 L. Ed.2d at 581. The Court's holding narrowly applied to a capital prosecution, but it is still relevant to this case in terms of the lack of need for a defendant's express consent to trial strategy.
>
> The Court expressly discussed situations in which the defense attorney has a duty to consult with the client and whether concessions of guilt function as a guilty plea. <u>Id.</u> at 187-88, 125 S.Ct. at 560-61, 160 L. Ed.2d at 578. The Court stated that "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy," but that obligation "does not require counsel to obtain the defendant's consent to 'every tactical decision.' " <u>Id.</u> at 188, 125 S.Ct. at 560, 160 L. Ed.2d at 578 (citations omitted). The Court pointed out that the defendant has the ultimate authority to plead guilty, waive a jury, testify, or take an appeal. <u>Ibid.</u> For these decisions, defense counsel is required to consult with the defendant and obtain consent to the recommended course of action. <u>Ibid.</u>
>
> However, the Court disagreed with the argument that concessions of guilt made to a jury are the functional equivalent of a guilty plea. <u>Id.</u> at 188, 125 S.Ct. at 561, 160 L. Ed.2d at 578. Despite any concessions, a defendant retains all of the rights of a defendant in a criminal trial. <u>Ibid.</u> The Court noted that the defense counsel in <u>Nixon</u> did explain his proposed trial strategy, but was not required to gain express consent before conceding his guilt to some offenses. <u>Id.</u> at 189, 125 S.Ct. at 561, 160 L. Ed.2d at 579.
>
> Based on <u>Nixon</u>, we conclude that defense counsel here was not obligated to obtain defendant's consent to the concession regarding the purse snatchings and the concessions to other lesser included offenses. It was not the equivalent to a guilty plea because defendant still retained all of the rights of a criminal defendant. Defense counsel's concessions served instead as general trial strategy in a legitimate effort to advance the defendant's best interest. <u>See</u> <u>Taylor v. Illinois</u>, 484 U.S. 400, 417-18, 108 S.Ct. 646, 98 L. Ed.2d 798, 816 (1988)

> ("Although there are basic rights that the attorney cannot waive without the fully
> informed and publicly acknowledged consent of the client, the lawyer has-and
> must have-full authority to manage the conduct of the trial."). [6]

2011 WL 13850, *5-6.

Here, the state courts correctly identified and applied the governing Supreme Court
precedents relevant to Petitioner's claim, *i.e.*, Nixon and Taylor, in concluding that Petitioner had
established neither inadequate performance nor prejudice under Strickland.  The Appellate
Division decision is neither contrary to nor an unreasonable application of Strickland.  Petitioner
is not entitled to relief on this claim.

       2.      Counsel's Alleged Consent to Petitioner's Appearance in Restraints

Petitioner contends that his trial counsel were constitutionally ineffective because they
consented to his being moved in a manner that permitted him to be seen by jurors while in
handcuffs.  As discussed above, the Appellate Division found that Petitioner had suffered no
prejudice from being seen in handcuffs while being transported.  To the extent the challenge was
cast as a claim for ineffective assistance of counsel, based upon their alleged initial consent to

---

[6] The Appellate Division further noted:

> Even were it conceded *arguendo* that counsel's performance was deficient
> because he failed to consult with defendant regarding the concessions, defendant
> cannot show that the concessions were prejudicial because of the overwhelming
> evidence of defendant's guilt of the facts conceded. See United States v. Thomas,
> 417 F.3d 1053, 1059-60 (9th Cir.2005), cert. denied, 546 U.S. 1121, 126 S.Ct.
> 1095, 163 L. Ed.2d 909 (2006) (two of three judges joined concurring opinion to
> the effect that defense counsel's "failure to consult and obtain consent" to
> conceding guilt of one charge was incompetent but not prejudicial); United States
> v. Larson, 66 M.J. 212, 218-19 (C.A.A.F.2008), cert. denied, 129 S.Ct. 267, 172
> L. Ed.2d 148 (2008) (same). Nor is this a case in which the defendant adamantly
> objected to counsel's concession of guilt. See Cooke v. State, 977 A.2d 803, 847
> (Del.2009).

Id. at *6.

the curative instruction, the claim was summarily rejected by the PCR court, (Answer, Ex. 35, Tr. at 54, 61), and by the Appellate Division, 2011 WL 13850, *9.

This Court agrees that the Appellate Division finding, that Petitioner did not suffer any prejudice from being occasionally seen in handcuffs while being transported, is not an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  In the absence of any prejudice, Petitioner cannot, under Strickland, establish that he was deprived of the effective assistance of counsel as to this issue.  Thus, the Appellate Division's summary denial of this claim was neither contrary to nor an unreasonable application of Strickland.  Petitioner is not entitled to federal habeas relief on this claim.

3.     Counsel's Failure to Requst a Charge on Manslaughter by Eluding

Petitioner asserts that his trial counsel were constitutionally ineffective in failing to request a "manslaughter while eluding" charge as a lesser-included offense of felony murder.

The state PCR court held an evidentiary hearing on this matter, at which one of Petitioner's trial co-counsel testified that his failure to request a charge on "manslaughter while eluding" was an oversight—because he did not even know that the charge existed—not a strategic decision.  State v. Pantusco, 2006 WL 1549687, *1.  The other trial co-counsel testified at the PCR hearing that the decision not to request the charge was a strategic decision, as both co-counsel had concluded that the "manslaughter while eluding" offense was inconsistent with the primary defense.  Id. at *1-*2.  The PCR court found that the decision not to request the "manslaughter by eluding" charge did not violate the Strickland standard, and the Appellate Division affirmed.

In its opinion reviewing the PCR court's decision, the Appellate Division referred to the PCR judge's opinion as "comprehensive."  Summarizing the PCR judge's findings, the Appellate

17

Division noted that the judge found both of Petitioner's co-counsel "to be credible', and did 'not

put a great circumstance on Mr. Rem's failure to remember that conversation' about the

manslaughter by eluding charge because of the PCR testimony as a whole 'and by virtue of what

occurred at the trial level.'"  The Appellate Division then quoted salient portions of the PCR

judge's thorough decision:

> A review of what was testified at the plenary hearing, and a review of the trial transcripts indicates a methodical, careful, and delineated position taken by counsel to insulate Mr. Pantusco from the felony murder charge; and, instead, try to present to the jury, as was testified to by Mr. Rem at the plenary hearing, a circumstance of having Mr. Pantusco be convicted of the aggravated manslaughter charge; or, at its best light, a vehicular homicide charge, as opposed to the felony murder charge.
>
> Even despite the best efforts of the State to preclude the admission of the State Police guidelines, Judge Sullivan allowed those guidelines into evidence, to allow the defendant to attack the causation argument, which underscored their entire argument that the accident itself was not the happenstance of the actions of the defendant, but, in fact, were in large part caused by the actions of the police in their pursuit of Mr. Pantusco, in not following the State Police guidelines. This underscores, in this Court's opinion, the careful and specific way in which the defense was prepared in this case.
>
> ....
>
> I do take into consideration the fact, to present this charge to that jury, in my opinion would have watered down the main thrust of the defense's argument, in attempting to have the jury stay away from the felony murder charge, in the sense that the elements of causation of felony murder and manslaughter while eluding are identical.
>
> It's a strict liability statute. It would have been illogical for me to consider that Mr. Rem, in light of his very precise and definitive testimony as to his means of presenting a defense to this jury, to then argue, even though he had indicated it would have been asked for if, in fact, it was presented to him and had he known about it, that the lesser-included manslaughter-charge of manslaughter while eluding should be given, since it was contrary to his causation argument to the jury, in trying to dissuade them from every way, shape, and form from a decision on felony murder.
>
> This Court agrees that the failure to request manslaughter while eluding, despite Mr. Rem's position that it would have been requested had he known about

[it], does not at all render his or Mr. Weichsel's representation of Mr. Pantusco ineffective in accordance with the applicable law delineating what is, in fact, ineffective counsel.

This is without regard to the fact that Mr. Weichsel remembers having a conversation with Mr. Rem, wherein both counsel considered the lesser-included charge of manslaughter while eluding and rejected it. As indicated previously, whether that conversation took place or not is of really no merit to this Court's decision.

State v. Pantusco, 2006 WL 1549687, *2-*3 (quoting the PCR decision at 20-25, attached as Ex. 35 to the Answer).

Following its recitation of the PCR judge's decision, the Appellate Division highlighted its agreement with the PCR judge that "the manslaughter by eluding charge 'would not have had an effect on the overall defense proffered by Mr. Rem and Mr. Weichsel at the trial level; which in fact … may have torpedoed that defense, to some degree.'" Id. at *3. Moreover, the Appellate Division reasoned:

Given the findings of the PCR judge, the application for PCR, premised on a claim of ineffective assistance of counsel, must be rejected, substantially for the reasons stated by the judge. Presentation of a lesser offense with a strict liability component would have cut against the defense endeavor to obtain a conviction for second degree death by auto. See Pantusco, supra, 330 N.J.Super. at 448-49. As we said in our opinion on the direct appeal:

The questions concerning whether defendant would be convicted of one or more robberies, whether the police dispatch would be sufficiently related to a robbery, and whether the jury could find that the chase and accident were sufficiently related to a "flight" therefrom, raised a real question of whether defendant would be convicted of felony murder. In that context, the possibility of acquittal of felony murder was not remote given the fact the judge charged death by auto as a lesser-included offense to aggravated manslaughter with defendant's consent, if not at his request, and the jury could have returned a homicide conviction without finding defendant guilty of either felony murder (with thirty years to be served before parole eligibility) or aggravated manslaughter (with a range of ten to thirty years).

[ Id. at 448 (footnotes omitted).]

19

We add that at the time of these offenses, manslaughter by eluding had a higher maximum term, fifteen years, than death by auto (vehicular homicide). See N.J.S.A. 2C:11-4, -5.

In any event, our review of the record does not permit us to conclude that a manslaughter by eluding charge would have led the jury to find defendant guilty of a lesser offense and not guilty of felony murder, see State v. Brent, 137 N.J. 107, 115-17 (1994), and we agree with the PCR judge that counsel's failure to request an instruction on manslaughter by eluding was not so deficient or "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984). See also State v. Fritz, 105 N .J. 42, 52, 58 (1987).

State v. Pantusco, 2006 WL 1549687, *3-*4.

As these excerpts illustrate, the state courts identified the governing Supreme Court precedent and carefully reviewed the facts and the various state criminal statutes in concluding that Petitioner's counsel had not violated his rights in declining to request a "manslaughter by eluding" charge.  The Appellate Division decision was, therefore, neither contrary to nor an unreasonable application of Strickland; nor was the Appellate Division decision based on an unreasonable determination of facts.  Accordingly, Petitioner is not entitled to federal habeas relief on this claim.  Similarly, as each of Petitioner's ineffective assistance challenges fails, Petitioner has not established that he is entitled to federal habeas relief based upon cumulative errors of his trial counsel.

C.    Felony Murder "Immediate Flight" Vagueness Claim

Petitioner argues that New Jersey Statute 2C:11-3(a)(3) on "felony murder" is unconstitutionally vague, as applied to him, because it does not clearly define "immediate flight" or provide any guidance as to the point at which an individual has stopped being in "immediate flight."  Petitioner further asserts that he was two miles away from the scene of the last robbery, which he contends had occurred 45 minutes earlier, and was not chased from the scene of the

robbery.  Petitioner raised this issue in his state PCR amended petition.  (Answer, Ex. 9, Amended Petition, Point 14, at Da103-Da104.)  The PCR court summarily denied relief, (Answer, Ex. 35, Tr. at 59-60 (June 20, 2007)), as did the Appellate Division, State v. Pantusco, 2011 WL 13850, *9.[7]

The Supreme Court has often recognized the basic principle, under the Due Process Clause of the Fifth and Fourteenth Amendments, that "a criminal statute must give fair warning of the conduct that it makes a crime."  Bouie v. City of Columbia, 378 U.S. 347, 350-51 (1964) (quoted in Rogers v. Tennessee, 532 U.S. 451, 457 (2001) (collecting cases)).  "A statute is unconstitutionally vague under the Due Process Clause if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2) authorizes or even encourages arbitrary and discriminatory enforcement."  U.S. v. Fontaine, 697 F.3d 221, 226 (3d Cir. 2012) (quoting U.S. v. Stevens, 533 F.3d 218, 249 (3d Cir. 2008) and Hill v. Colorado, 530 U.S. 703, 732 (2000)) (internal quotation marks omitted).  To avoid arbitrary and discriminatory enforcement, a criminal statute must establish minimal guidelines to govern police, prosecutors, and juries.  See Kolender v. Lawson, 461, U.S. 352, 357-58 (1983); U.S. v. Tyler, 281 F.3d 84, 90 n.5 (3d Cir. 2002).  Where, as here, a criminal statute does not involve behavior protected by the First Amendment, a court must determine whether the statute is vague "as applied" to the affected party, with reference to the facts of the case at hand.  U.S. v. Fontaine, 697 F.3d 221, 226 (3d Cir. 2012) (collecting cases).[8]  "The judgment of federal courts

---

[7] In addition, on direct appeal, Petitioner unsuccessfully argued that there was not sufficient evidence to establish that the automobile crash occurred during immediate flight from a robbery. See State v. Pantusco, 330 N.J. Super. 424, 430, 438-444 (N.J. Super. App. Div. 2000).

[8] In the context of a statute involving behavior protected by the First Amendment, courts "are concerned with the vagueness of the statute 'on its face' because such vagueness may in itself deter constitutionally protected and socially desirable conduct."  U.S. v. Nat'l Dairy Prods.

as to the vagueness … of a state statute must be made in the light of prior state constructions of

the statute.  For the purpose of determining whether a state statute is too vague and indefinite to

constitute valid legislation 'we must take the statute as though it read precisely as the highest

court of the State has interpreted it.'"  <u>Wainwright v. Stone</u>, 414 U.S. 21, 22-23 (1973) (citation

omitted); <u>Pringle v. Court of Common Pleas</u>, 778 F.2d 998, 1001 (3d Cir. 1985).

      The New Jersey felony murder statute, N.J.S.A. 2C:11-3(a)(3), provides that a criminal

homicide constitutes murder when an actor causes the death of any person, other than a

participant, while the actor "is engaged in the commission of [one of the predicate crimes] or

immediate flight therefrom."  In rejecting Petitioner's "sufficiency of the evidence" claim on

direct appeal, the Appellate Division outlined the New Jersey state courts' interpretations of the

"immediacy" requirement and applied those interpretations to the facts of this case.

> Defendant also contends that the proofs reflect that the pursuit did not
> "immediately" follow the robberies, as N.J.S.A. 2C:11-3a(3) requires. However,
> immediacy refers to "a reasonable time in view of the particular facts and
> circumstances of the case," <u>State in re J.R.</u>, 234 N.J.Super. 388, 394, 560 A.2d
> 1279 (Ch.Div.1988), and felony murder is established "when the initial crime and
> the murder are closely connected in point of time, place, and causal connection
> and are integral parts of one continuous transaction," <u>State v. Mirault</u>, 92 N.J.
> 492, 500, 457 A.2d 455 (1983). <u>Accord</u>, <u>State in re J.R.</u>, <u>supra</u>, 234 N.J.Super. at
> 388, 560 A.2d 1279 (the question is whether "[t]he [felony], flight and death in
> this case represent a continuous, indivisible transaction"; juvenile transferred to
> Law Division for felony murder prosecution where death occurred following
> chase from the scene of a burglary).
>
> In <u>Mirault</u>, <u>supra</u>, 92 N.J. at 500-01, 457 A.2d 455, the Supreme Court, in
> relating the flight component of a robbery to the "analogous" concept of felony
> murder, made clear that "[t]he question in each felony murder case related to
> robbery is one of fact: whether the offender, before inflicting the injury that
> causes death, has reached a point of at least temporary safety ... or become subject
> to 'complete custody.' " <u>See also</u> <u>State v. Spencer</u>, 319 N.J.Super. 284, 308-09,
> 725 A.2d 106 (App.Div.1999) (noting that the predicate offense and the homicide
> must be "closely connected in point of time, place and causal connection [so as to

<u>Corp.</u>, 372 U.S. 29, 36 (1963) (citation omitted) (quoted in <u>U.S. v. Fontaine</u>, 697 F.3d at 226
n.9.)

constitute] integral parts of one continuous transaction," but that reaching point of "temporary safety" does not per se prevent a finding of the requisite nexus); <u>State v. Smith</u>, 210 N.J.Super. 43, 47-48, 509 A.2d 206 (App.Div.), <u>certif. denied</u>, 105 N.J. 582, 523 A.2d 210 (1986) (evidence sufficient to sustain felony murder on appropriate instructions where, after committing armed robbery, the defendant drove away, ran through the stop sign at the end of the street and hit another car, whose driver had a heart attack and later died).

In this case the chase took between about three to five minutes, and commenced approximately twenty or twenty-five minutes after the last robbery. There is no basis for finding as a matter of law that in spending less than twenty-five minutes in rush-hour traffic defendant "reached a point of at least temporary safety," <u>Mirault</u>, <u>supra</u>, 92 N.J. at 501, 457 A.2d 455, or otherwise severed the connection between the last robbery and the pursuit that began while defendant was still on the road. In short, this record did not preclude the jury from finding that the robbery and the flight resulting in Carroll's death were part of a "continuous transaction." <u>Ibid.</u>

<u>State v. Pantusco</u>, 330 N.J. Super. 424, 442-44 (N.J. Super. App. Div. 2000).

Here, as noted by the Appellate Division, various New Jersey courts had interpreted the "immediacy" component of the felony murder statute long before the events at issue, in a consistent manner, clearly giving notice that the question of "immediate flight" was one for the jury to determine by considering time, place, and causation.  <u>Cf.</u> <u>Proffitt v. Florida</u>, 428 U.S. 242, 255-56 (1976) (rejecting "void for vagueness" challenge to Florida death penalty provision "aggravating circumstances," based on consistent interpretations by Supreme Court of Florida that provided "[adequate] guidance to those charged with the duty of recommending or imposing sentences in capital cases"); <u>Butler v. O'Brien</u>, 663 F.3d 514 (1st Cir. 2011) (rejecting "void for vagueness" challenge to term "resulting in serious bodily injury" in Massachusetts aggravated rape statute based, in part, on prior state court interpretations of the statute).  In light of that history, it cannot be said that the "immediate flight" provision was unconstitutionally vague as applied to a death that occurred as the result of an automobile accident less than 30 minutes after the last of three robberies in one afternoon, only a few miles from the site of the robbery, and

while the perpetrator was still in the car in which he committed the robberies, driving through

rush hour traffic.  Cf. People v. Donovan, 53 A.D.2d 27 (N.Y. App. Div. 1976) (upholding a

conviction under New York "immediate flight" provision for killing a trooper 45 minutes and 37

miles from the scene of a robbery) (cited in State in re J.R., 234 N.J. Super. at 393, in discussion

of the meaning of New Jersey "immediate flight" provision).

The Appellate Division decision summarily rejecting Petitioner's "void for vagueness"

claim is neither contrary to nor an unreasonable application of governing Supreme Court

precedent.  Petitioner is not entitled to federal habeas relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of

appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C.

§ 2254.  A certificate of appealability may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies

this standard by demonstrating that jurists of reason could disagree with the district court's

resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322,

327 (2003).  Here, Petitioner has not made a substantial showing of the denial of a constitutional

right.  Accordingly, no certificate of appealability will issue.

## V.  CONCLUSION

For the reasons set forth above, the Petition shall be denied.  An appropriate Order

follows.

_s/Susan D. Wigenton_
Susan D. Wigenton
United States District Judge

Dated:  August 16, 2013

24